**FILED**

APR − 8 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
Deputy Clerk

**ENTERED**

APR 08 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>VALLEY HEALTH SYSTEM, a<br>California Local Health Care District,<br><br>              Debtor.<br>_____<br><br>PRIME HEALTHCARE MANAGEMENT,<br>INC., a California corporation, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>VALLEY HEALTH SYSTEM, a<br>California Local Health Care District,<br>et al.,<br><br>              Defendants.<br>_____ | Case No. 6:07-bk-18293-PC<br><br>Chapter 9<br><br>Adversary No. 6:09-ap-01708-PC<br><br>**MEMORANDUM DECISION RE:**<br>**CONFIRMATION OF FIRST**<br>**AMENDED PLAN OF ADJUSTMENT**<br>**OF DEBTS OF VALLEY HEALTH**<br>**SYSTEM DATED DECEMBER 17,**<br>**2009, AS MODIFIED ON FEBRUARY**<br>**19, 2010, AND ADJUDICATION OF**<br>**THE CHALLENGE ACTIONS**<br><br>Date:  February 22, 2010<br>Time:  10:30 a.m.<br>Place:  United States Bankruptcy Court<br>        Courtroom # 304<br>        3420 Twelfth Street<br>        Riverside, CA 92501 |

Valley Health System, a California Local Health Care District ("VHS") seeks

confirmation of its First Amended Plan for the Adjustment of Debts of Valley Health System

Dated December 17, 2009, as modified on February 19, 2010 (the "Modified First Amended

Plan") pursuant to § 943(b) of the Bankruptcy Code,[1] dismissal of the complaint in the above

referenced adversary proceeding, and adjudication of other causes of action alleged by Save the

Hospitals, Inc.,[2] Prime Healthcare Services, Inc.,[3] Prime Healthcare Management, Inc.,[4] Albert L.

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule"
references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable
certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "AR" references are to the 1,822-page
administrative record lodged by VHS with the court on February 1, 2010.

[2] Save The Hospitals, Inc. is a California corporation organized on October 15, 2009. The
corporation's principal place of business is Ontario, California. Save The Hospitals, Inc. does

1  Lewis, Jr. ("Lewis"), John Lloyd ("Lloyd"), and Edward J. Fazekas ("Fazekas")[5] that arise under

2  state law and impact the feasibility of VHS's Modified First Amended Plan.  At the hearing,

3  Gary E. Klausner, Daniel K. Spradlin, and M. Lois Bobak appeared for VHS; R.D. Kirwan and

4  Carlyle W. Hall, Jr. appeared for Physicians for Healthy Hospitals, Inc. ("PHH");[6] Marc W.

5  Rappel, Robert A. Klyman, Nathan M. Smith, and Daniel P. Brunton appeared for Save the

6  Hospitals, Inc., Prime Healthcare Services, Inc. and Prime Healthcare Management, Inc.

7  (collectively, "Prime"), Lewis, Lloyd, & Fazekas;[7] Samuel R. Maizel appeared for the Official

8  Committee of Unsecured Creditors (the "Committee");[8] Peter J. Mort appeared for Kali P.

9

10  not have any public members.  It is not a creditor in VHS's bankruptcy case nor is it a resident or
taxpayer in the VHS district.

11

12  [3] Prime Healthcare Services, Inc. is a Delaware corporation, qualified to do business in
California.  Prime Healthcare Services, Inc. is owned by Prem Reddy, M.D. ("Reddy") (10%
interest) and the Prem Reddy Family Foundation (90%).  Reddy, in turn, is the sole director and

13  member of the Prem Reddy Family Foundation, which has no employees.  Prime Healthcare

14  Services, Inc., by and through its affiliates and subsidiaries, owns and operates 13 acute care
hospitals throughout California.  None of the hospitals are located within the geographic borders

15  of the VHS district, nor is the corporation a resident or taxpayer in the VHS district.

16  [4] Prime Healthcare Management, Inc. is a California corporation conducting business in

17  California.  Reddy owns 100% of Prime Healthcare Management, Inc., which provides
management services to Prime Healthcare Services, Inc.  Prime Healthcare Management, Inc. is

18  not a creditor in VHS's bankruptcy case nor is it a resident or taxpayer in the VHS district.

19  [5] Lewis, Lloyd, and Fazekas are citizens of California and residents of Riverside County.  Lewis,
Lloyd, and Fazekas each reside in communities within the geographic boundaries served by the

20  VHS district.  Lewis, Lloyd and Fazekas are not creditors of VHS.

21  [6] PHH is a Delaware corporation organized on June 18, 2009.  PHH is qualified to do business

22  in California.  The directors and officers of PHH are: Sreenivasa Nakka, M.D., President and
Director; Ratan Tiwari, M.D., Vice President and Director; Bhoodev Tiwari, M.D., Vice

23  President; Girdhari Purohit, M.D., Vice President; and Anil Rastogi, M.D., Secretary/CFO.

24  [7] Save the Hospitals, Inc., Prime, Lewis, Lloyd, and Fazekas are, at times, collectively referred to

25  as "the petitioners."

26  [8] The Committee appointed on March 26, 2008, consists of (a) SEIU, United Healthcare
Workers - West ("SEIU"); (b) Universal Health Services of Rancho Springs, Inc.; (c) LHIO, LLC

27

1   Chaudhuri, M.D. ("Chaudhuri"); Nathan F. Coco appeared for U.S. Bank, as Indenture Trustee

2   for the holders of the Valley Health System Certificates of Participation (1993 Refunding

3   Project) and the Valley Heath System District Revenue Bonds (Refunding and Improvements

4   Project) 1996 Series A ("U.S. Bank"); and Jay N. Hartz and Robert A. Davis, Jr. appeared for

5   Hemet Community Medical Group, Inc. ("HCMG").  The court, having considered VHS's

6   Modified First Amended Plan, the petitioners' objections thereto,[9] the petitioners' claims against

7   VHS under state law,[10] the evidentiary record, and arguments of counsel, makes the following

8   findings of fact and conclusions of law[11] pursuant to F.R.Civ.P. 52(a)(1), as incorporated into

9   FRBP 7052 and applied to contested matters by FRBP 9014(c).

10                              I. STATEMENT OF FACTS

11  A.      VHS – The District

12          VHS is a public agency formed in 1946 under the State of California Local Health Care

13  District Law ("LHCDL").[12]  VHS serves a district that encompasses 882 square miles in the San

14  Jacinto Valley in Riverside County, California, with a population within the district of nearly

15  360,000.  At its inception, VHS operated only an 18-bed hospital purchased from the city of

16  _____

17  ("LHIO"); (d) Sodexo USA, Inc.; (e) HCR Manor Care, Inc.; (f) Hemet Healthcare Surgery, Inc.;
18  (g) Anaheim Memorial Medical Center; (h) HCMG; and (i) Southland Endoscopy Center.

19  [9] Save the Hospitals, Inc., Prime Healthcare Services, Inc., Lewis, Lloyd, and Fazekas object to
    confirmation of the VHS's Modified First Amended Plan.
20

21  [10] Prime Healthcare Management, Inc., Lewis, Lloyd, and Fazekas allege certain claims against
    VHS and PHH under state law.  The parties have stipulated to the jurisdiction of this court to
22  decide such claims in conjunction with confirmation of VHS's Modified First Amended Plan.
    See Stipulation, infra note 39.
23

24  [11] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby
    adopted as such.  To the extent that any conclusion of law is construed to be a finding of fact, it is
25  hereby adopted as such.

26  [12] Cal. Health & Safety Code § 32000, et seq.  Residents within VHS's territorial boundaries do
    not pay any taxes to VHS.
27

                                          - 3 -

1  Hemet, California.  On the petition date, VHS owned and operated the Hemet Valley HealthCare

2  Center (the "Skilled Nursing Facility"), a 113-bed skilled nursing facility in Hemet, California,

3  together with three acute hospitals -- Hemet Valley Medical Center ("Hemet Hospital"), a 340-

4  bed facility in Hemet, California; Menifee Valley Medical Center ("Menifee Hospital"), an 84-

5  bed facility in Sun City, California; and Moreno Valley Community Hospital ("Moreno Valley

6  Hospital"), a 95-bed facility in Moreno Valley, California.  The Moreno Valley Hospital and its

7  primary service area were situated outside VHS's boundaries.  Each of the hospitals provided

8  comprehensive health services and 24-hour emergency medical services.[13]

9      The cost of VHS's comprehensive health care system was financed, in large part, by two

10  series of bonds issued by VHS (collectively, the "Bonds"): (1) the $61,650,000 Valley Health

11  System Certificates of Participation (1993 Refunding Project); and (2) the $47,335,000 Valley

12  Health System District Revenue Bonds (Refunding and Improvements Project) 1996 Series A.

13  U.S. Bank, VHS's largest creditor, was owed approximately $84 million in principal and interest

14  on the Bonds as of the date of the petition.

15  B.      Events Leading to Bankruptcy

16      Before filing its petition, VHS communicated with its major creditors, including U.S.

17  Bank, and the two labor unions that had been certified as the bargaining representatives for

18  certain VHS employees – SEIU and the California Nurses Association ("CNA").  VHS advised

19

20

21  [13] Services offered at the Hemet Hospital include the Emory J. Cripe Radiation Therapy
Treatment Center for cancer treatment; cardiac care services; inpatient and outpatient surgical
22  services; behavioral health services; speech, physical, and occupational therapy services; and CT
imaging and magnetic resonance imaging.  The Menifee Hospital provided inpatient and
23  outpatient X-ray services, including mammography, CT scan, and MRI services; a critical care
unit; inpatient and outpatient surgery; inpatient and outpatient laboratory services; respiratory
24  services; physical therapy services; a joint replacement center; and cataract and retina specialty
surgeries.  The Moreno Valley Hospital offered inpatient medical, surgical and pediatric services;
25  critical care, post-critical care, and telemetry units; maternity and women's services; obstetrics;
26  inpatient and outpatient surgery; the Spine Center of Excellence program; cardiopulmonary
services; and physical rehabilitation services.
27

1  its creditors and the unions of its intention to seek relief under chapter 9, and assured them that it

2  would negotiate a plan of adjustment consistent with the requirements of chapter 9 once it

3  developed a viable business plan. VHS's Board of Directors approved the chapter 9 filing only

4  after a public meeting, noticed in accordance with state law, at which attendees were advised of

5  VHS's intention to file a chapter 9 petition and given the opportunity to question the board of

6  directors and its professionals and to be heard on the issue. VHS's decision "was made only

7  after a careful review of all options and strategies and with the input and guidance of consultants

8  with expertise in healthcare restructuring, corporate counsel, bond counsel, and bankruptcy

9  counsel."[14]

10      VHS sought relief under chapter 9 only after exhausting its efforts to solve its financial

11  problems through an out-of court restructuring of debt or the sale of its assets. Two years earlier,

12  VHS had attempted to restructure its debt through Riverside County Measure I ("Measure I")

13  which contemplated the issuance of $485 million in general obligation bonds, secured by

14  property tax revenues, to retire VHS's special revenue bond debt, finance necessary capital

15  improvements, and provide VHS the time and capital required to return to profitability. Measure

16  I was rejected by the voters on September 16, 2005. VHS then attempted to improve its liquidity

17  through the sale of assets.

18      On August 8, 2007, VHS approved a sale of substantially all of its assets to Select

19  HealthCare Solutions ("Select"), subject to voter approval in accordance with California law.

20  Select and VHS further agreed that, in the event the sale was not approved by the voters, then

21  Select would have the opportunity to purchase the Moreno Valley Hospital from VHS for $47

22  million. Voters rejected Riverside County Measure G ("Measure G"), which sought approval of

23  the asset sale to Select, on November 6, 2007 – 37 days before VHS filed its chapter 9 petition.

24

---

25  [14] VHS's Reply to Objection of U.S. Bank as Indenture Trustee and Limited Objection of SEIU-
26  United Healthcare Workers – West and Local 121 RN to Chapter 9 Petition of Valley Health
    System, 3:1-3.
27

1   The Moreno Valley Hospital was generating monthly losses of between $300,000 to $500,000,

2   and Select had not pursued its opportunity to purchase the hospital from VHS prior to the petition

3   date.

4        VHS's method for generating revenue exacerbated its operating losses.  VHS derived its

5   income from a complicated system of capitation and sub-capitation agreements.  VHS was losing

6   money under its capitation contracts, as well as the associated capitation risk pools formed with

7   certain physician groups.  The unpaid risk pool liability alone associated with these capitation

8   contracts exceeded $16 million on the petition date, and VHS had not reserved funds for the

9   payment of these liabilities.

10       QHR Consulting Services ("QHR"), a turnaround specialist, was retained by VHS on

11  October 15, 2007 to analyze VHS's operations and complex contractual relationships, stabilize

12  VHS's financial situation, and assist in formulating a business plan to return VHS to profitability.

13  QHR examined VHS's $250 million annual budget before undertaking the task of framing a

14  meaningful business plan.  Based on its preliminary findings, QHR recommended operational

15  changes to increase VHS's revenues by approximately $12 million without materially increasing

16  expenses and to eliminate approximately $20 million in annual expenses with no degradation to

17  the quality of VHS's operations.  QHR determined that the key to returning VHS to profitability,

18  however, hinged upon (1) negotiating fee for service agreements to replace its capitation

19  contracts; and (2) consummating a sale of the Moreno Valley Hospital.

20  C.    VHS's Chapter 9 Petition

21       On December 13, 2007, VHS filed a voluntary petition under chapter 9 in this case

22  disclosing approximately 5,000 creditors holding claims in excess of $100 million.  On January

23  11, 2008, the court denied the United States trustee's motion seeking appointment of a patient

24  care ombudsman pursuant to § 333(a)(1).[15]  On February 20, 2008, the court overruled the

25

26  _____

27  [15] In re Valley Health Sys., 381 B.R. 756, 765 (Bankr. C.D. Cal. 2008).

1  objections of U.S. Bank and SEIU to VHS's petition and denied U.S. Bank's motion to dismiss,

2  holding that VHS had established that it was eligible for relief under chapter 9 and "was unable

3  to negotiate with creditors prior to the filing of its chapter 9 petition . . . because negotiation was

4  impracticable within the meaning of § 109(c)(5)(C)."[16]

5  D.    Relevant Events During Bankruptcy

6       After the filing of the petition, VHS renegotiated its contracts with Blue Cross, Health

7  Net, PacifiCare (United Health Care), Secure Horizons (United Health Care), Inter Valley, Inland

8  Empire Health Plan, and SCAN resulting in an estimated $1.2 million per month reduction in

9  operating losses.  Extensive negotiations between VHS, Select and Kaiser Hospital Foundation

10  ("Kaiser") resulted in a court-approved sale of the Moreno Valley Hospital to Kaiser for

11  approximately $53 million on May 20, 2008, which, among other things, reduced VHS's debt to

12  Select by $10.4 million and VHS's liability to U.S. Bank on the Bonds by nearly $40 million.

13  VHS closed the Skilled Nursing Facility in December 2008,[17] sold its interest in Hemet Global

14  Services to HCMG for $3.4 million, and successfully renegotiated its labor agreements with

15  CNA and SEIU.

16       On May 21, 2009, VHS posted public notice under the Brown Act[18] that the VHS Board

17

18  [16] In re Valley Health Sys., 383 B.R. 156, 165 (Bankr. C.D. Cal. 2008).

19  [17] VHS continues to operate a chemical dependency and post-treatment retreat center on grounds

20  previously occupied by the Skilled Nursing Facility.

21  [18]  Under the Brown Act, the legislative body of a local agency, or its designee, must post an

22  agenda at least 72 hours before a regular meeting briefly describing each item of business to be
transacted or discussed at the meeting.  Cal. Gov't Code § 54954.2(a).  The Brown Act also

23  provides that a special meeting may be called at any time upon 24 hours notice specifying the
time and place of the special meeting and the business to be transacted or discussed.  Cal. Gov't

24  Code § 64956.  Michael Sarrao, Vice President and General Counsel for Prime Healthcare

25  Services, Inc. ("Sarrao"), received email notification of each of the relevant VHS Board of
Directors' meetings at issue in this case.  Prime does not raise any legal challenge regarding

26  whether the notice or agenda posted by VHS for each of these regular or special meetings of
VHS's Board of Directors met the requirements of the Brown Act.

27

1    of Directors would meet on May 27, 2009, to consider VHS's most recent financial statements.

2    At the meeting on May 27, 2009, Melanie Van Winkle, Vice President of Finance, presented the

3    Board of Directors with VHS's financial statements for the ten month period ending April 30,

4    2009. The statements confirmed that, despite fundamental changes in VHS's operations, VHS

5    was continuing to operate at a substantial loss. In response thereto, the VHS Board of Directors

6    formed an Ad Hoc Subcommittee of three board members, Vinay M. Rao, Glen Holmes, and

7    Amelia Hippert, to oversee "all aspects of the development and implementation of a financial

8    restructuring plan for the District."[19]

9        On June 26, 2009, VHS posted public notice that its Board of Directors[20] would meet on

10    June 29, 2009, to consider VHS's most recent financial statements and operating plans. At the

11    meeting on June 29, 2009, Hippert announced that VHS would henceforth "pursue a dual track in

12    addressing [VHS's] severe financial problems," stating that VHS would both "honor [its]

13    commitment to developing and implementing fiscal controls to stem continued losses," and

14    "simultaneously explore the potential sale of [VHS's] assets."[21]

15        VHS sustained a net loss of approximately $7.5 million for the fiscal year ending June 30,

16    2009. Although an improvement over the $17.8 million loss for the prior fiscal year, VHS

17    projected that it would do no better than break even from operations for the fiscal year ending

18    June 30, 2010. Heeding concerns of the Committee and U.S. Bank that it could run out of cash

19    by spring of 2010, VHS weighed all strategic options and slowly shifted the focus of a proposed

20    plan of adjustment from a financial restructuring of the district to a sale or lease of its remaining

21    ────────────────

22    [19] Joint Pre-Trial Order, 7:8-9.

23    [20] At all material times after June 24, 2009, the VHS Board of Directors consisted of the
24    following members: William Cherry, M.D. ("Cherry"), Chairman; Amelia Hippert ("Hippert"),
     Vice Chairwoman; Robert O'Donnell ("O'Donnell"), Secretary; Vinay M. Rao ("Rao"),
25    Treasurer; Tom Wilson ("Wilson"), Director; Glen Holmes ("Holmes"), Director; and Madaleine
     Dreier ("Dreier"), Director.

26
27    [21] AR00026.

1  two facilities – Hemet Hospital and Menifee Hospital.

2       On July 14, 2009, VHS posted public notice that its Board of Directors would meet on

3  July 15, 2009, to consider approval of an agreement with The Peira Group for consulting services

4  in connection with a potential sale of VHS's assets.  On July 15, 2009, the VHS Board of

5  Directors approved a consulting agreement with The Peira Group at a public meeting.

6  E.    VHS's Plan of Adjustment

7      1. Exclusive Negotiation Agreement

8       On July 24, 2009, PHH contacted VHS regarding its interest in purchasing substantially

9  all of VHS's assets.  To expedite the negotiations, PHH requested an exclusive right to negotiate

10  with VHS for a period of 90-days regarding a purchase of its assets and provided a draft

11  agreement (the "letter agreement") for VHS to consider at its next meeting.  That day, VHS

12  posted public notice that its Board of Directors would meet on July 27, 2009, to consider

13  approval of the letter agreement between VHS and PHH.

14       At the meeting on July 27, 2009, the VHS Board of Directors voted 5-2 to approve the

15  letter agreement between VHS and PHH with Cherry, Hippert, Dreier, Holmes, and Rao voting

16  for approval.  On July 30, 2009, VHS executed a letter agreement with PHH, effective on July

17  27, 2009, pursuant to which VHS agreed to negotiate exclusively with PHH for a period of 90

18  days for the sale of substantially all of its assets, including the Hemet Hospital and Menifee

19  Hospital.

20       On July 30, 2009, Universal Health Services ("Universal"), a publicly traded company,

21  sent Cherry a letter expressing its interest in purchasing substantially all of VHS's healthcare

22  facilities for approximately $25 million.  By letter dated August 13, 2009, Prime also advised

23  VHS of its interest in purchasing substantially all of VHS's assets, including the Hemet Hospital

24  and Menifee Hospital, for an unspecified amount.  On August 14, 2009, VHS responded that

25  VHS was subject to an exclusive negotiation agreement with PHH.

26

27

- 9 -

2. Memorandum of Understanding and Term Sheet

On September 15, 2009, VHS posted public notice that its Board of Directors would meet on September 16, 2009, to consider, among other things, a proposed Memorandum of Understanding and Term Sheet ("MOU/TS") between VHS and PHH concerning the sale of substantially all of VHS's assets to PHH for an estimated price of $156,000,000. On September 16, 2009, VHS's Board of Directors, at the conclusion of a public session, voted 6-1 to approve a non-binding MOU/TS providing for the sale of substantially all of VHS's assets to PHH, subject to voter approval. Cherry, Hippert, Dreier, Holmes, Rao, and Wilson voted to approve the MOU/TS and three resolutions calling for a special election. An initiative election to secure voter approval was scheduled for December 15, 2009. The MOU/TS further provided that, in the event the sale was not approved by voters, VHS would sell the Menifee Hospital to PHH but retain and continue to operate the Hemet Hospital (the "Alternate Sale"). VHS and PHH agreed to "negotiate, finalize and enter into a mutually acceptable form of an Asset Sale Agreement . . . , on terms generally consistent with the terms of [the MOU/TS], and to reasonably resolve any other issues not addressed [by the MOU/TS], by October 5th, 2009."[22]

3. Fair Consideration Opinion

On October 5, 2009, Valuation & Information Group ("V&IG")[23] presented the VHS Board of Directors with a document entitled "An Assessment and Comparison Between the Fair Market Value of Valley Health System and Related Assets and The Transaction Consideration

---

[22] AR01542.

[23] V&IG is a healthcare valuation and financial consulting business serving clients throughout the nation. V&IG is composed of licensed and experienced real estate appraisers, financial analysts, and healthcare industry professionals. V&IG had been retained by VHS to prepare an appraisal of (a) the Hemet Hospital; (b) the Menifee Hospital; (c) the three vacant parcels adjacent to the Menifee Hospital; (d) the Skilled Nursing Facility; (e) the Hemet Valley Medical Arts Building; and (f) five accessory buildings. VHS and Prime, which each engaged the professional services of V&IG on unrelated matters prior to the sale at issue in this case, stipulated that V&IG is a qualified appraiser for purposes of California Health & Safety Code § 32121(p).

1  By and Between PHH for Healthy Hospitals and Valley Health System" (the "Fair Consideration

2  Opinion"). In conjunction with the Fair Consideration Opinion, V&IG appraised the following

3  properties of VHS:

4

| Property | Value As of August 5, 2009 |
|---|---|
| Hemet Hospital | $27,830,000[24] |
| Menifee Hospital | 25,800,000[25] |
| Menifee – Adjacent Vacant Parcels | 6,830,000[26] |
| Skilled Nursing Facility | 4,500,000[27] |
| Hemet Valley Medical Arts Building | 8,700,000[28] |
| Five Accessory Buildings | 3,330,000[29] |

8  V&IG concluded in its Fair Consideration Opinion that, as of August 5, 2009, "[t]he Transaction

9  Consideration of $169.773 million (including approximately $55 million of disputed claims) by

10  and between PHH and VHS is equal to or greater than our estimate of the fair market value of the

11  VHS Assets to be transferred in the Transaction, and that such amount constitutes fair and

12  reasonable consideration to be received by VHS for the transferred assets as provided in Health

13  & Safety Code Section 32121(p)."[30]  With the Fair Consideration Opinion, the terms and

14  conditions of the MOU/TS were reduced to an Asset Sale Agreement ("ASA") between VHS and

15  PHH.

16

17

18

---

19  [24] AR00901. V&IG's appraisal of Hemet Hospital states a value of $27,330,000 as of August 5, 2009. V&IG increased this valuation by $500,000 in its Fair Consideration Opinion.

20  [25] AR00473.

21  [26] AR00474.

22

23  [27] AR01247. V&IG's appraisal of the Skilled Nursing Facility states a value of $4,550,000 as of August 5, 2009. V&IG reduced this valuation by $50,000 in its Fair Consideration Opinion.

24  [28] AR01093.

25  [29] AR00703.

26  [30] AR01602.

27

- 11 -

1    4. Asset Sale Agreement

2    On October 5, 2009, VHS posted public notice that its Board of Directors would meet on

3    October 6, 2009, to consider approval of the ASA between VHS and PHH. On October 6, 2009,

4    the VHS Board of Directors, at the conclusion of a public session, voted 6-1 to approve the ASA

5    substantially in the form presented to the directors. Cherry, Hippert, Dreier, Holmes, Rao, and

6    Wilson voted to approve the ASA. The ASA was executed on October 14, 2009.

7    On November 2, 2009, VHS filed a disclosure statement and proposed plan of adjustment

8    predicated upon the asset sale alternatives set forth in the ASA. At the election on December 15,

9    2009, VHS's proposal to sell substantially all of its assets to PHH received voter approval by a

10   wide margin.[31] On December 16, 2009, VHS filed its First Amended Plan for the Adjustment of

11   Debts of Valley Health System Dated December 17, 2009 ("First Amended Plan"), together with

12   a First Amended Disclosure Statement With Respect to the Plan for the Adjustment of Debts of

13   Valley Health System Dated December 17, 2009 ("First Amended Disclosure Statement")

14   deleting any reference to the Alternate Sale.[32] By order entered on December 23, 2009, the court

15   _____

16   [31] The Riverside County Registrar of Voters certified the election results as 87.07% in favor of
     the sale and 12.93% in opposition to the sale. See Exhibit 247.

17

18   [32] The ASA, as incorporated into VHS's First Amended Plan, will, among other things: (a) cause
     the allowed claims of VHS's bondholders [Classes 1A and 1B] (net of reserves held by VHS) to

19   be paid in full, in cash at the time of the closing of the ASA; (b) provide VHS with $4 million
     cash to be used for payment of those administrative claims that are not being assumed by PHH at

20   closing as well as additional funds that may be needed to pay administrative expenses; (c)
     provide $1.7 million, in installments through the fourth anniversary of the closing under the

21   ASA, to the holders of allowed general unsecured claims of VHS [Class 2A], which sum may be
     adjusted upward or downward, depending on the total amount of administrative claims that are

22   not assumed by PHH at closing; (d) assume substantially all of VHS's post-petition obligations;

23   (e) cause the 5% unsecured promissory note of VHS payable to Select VHS Acquisition
     Company, LLC in the approximate amount of $8.9 million that is entitled to administrative

24   priority status, to be satisfied; (f) pay VHS the sum of $400,000 per year for a period of five years
     to sustain it as a California Local Health Care District; (g) assume VHS's obligations for accrued

25   employee paid time off; (h) assume VHS's obligations for accrued extended sick leave; (i)

26   maintain core services, such as basic emergency services for at least five years as provided for in
     the ASA; (j) cause certain disputed claims filed in VHS's bankruptcy case, which PHH estimates

27

- 12 -

1    approved VHS's First Amended Disclosure Statement, established confirmation procedures, and

2    set a hearing on confirmation of VHS's First Amended Plan for February 9, 2010.

3    F.    The Challenge Actions

4        Due to the 90-day exclusivity agreement that preceded the MOU/TS and ASA, Prime was

5    blocked from negotiating the terms of a competing offer to purchase the assets of VHS.  As a

6    result, Prime took steps to prevent consummation of the sale between VHS and PHH (the

7    "Challenge Actions").

8        1. The Measure P Action

9        On October 15, 2009, Lewis filed a complaint against Barbara Dunmore, Registrar of

10    Voters for the County of Riverside, in Case No. RIC538119, styled Lewis v. Dunmore, in the

11    Superior Court of California, County of Riverside, seeking to enjoin Dunmore from placing

12    Measure P on the ballot for the election on December 15, 2009.  Lewis asserted that the language

13    of Measure P, as adopted by VHS's Board of Directors, allegedly was false and misleading.

14    Lewis's complaint named VHS and Cherry, its Chairman of the Board, as the "Real Parties in

15    Interest."[33]  On October 23, 2009, the Superior Court denied Lewis's request for a hearing on

16    shortened time and the election went forward on December 15, 2009.

17        2. The Public Records Act Action

18        On October 27, 2009, Prime filed a complaint in Case No. RIC538931, styled Prime

19    Healthcare Management, Inc. v. Valley Health System, et al., in the Superior Court of California,

20    County of Riverside, to compel the disclosure of documents concerning the sale to PHH

21    contemplated by the ASA, including certain reports completed by The Peira Group (the "Peira

22    ───────────────────

23    to total approximately $55 million, to be assumed by PHH and withdrawn; (k) employ
      substantially all of VHS's employees; (l) assume the collective bargaining agreements with SEIU

24    and CNA; (m) accept an immediate assignment of the executory contracts and unexpired leases
      that PHH notifies VHS to assume; and (n) pay the premiums for error and omissions tail

25    insurance for VHS ($3.75 million) and director and officer tail insurance ($450,000).

26

27    [33] Lewis did not seek relief from the automatic stay before proceeding with the state court action.

1   Reports") and the "Evaluation Material" referred to in the letter agreement between VHS and

2   PHH dated July 27, 2009, pursuant to the California Public Records Act.[34] At an expedited

3   hearing on November 23, 2009, the state court ordered VHS to produce the Peira Reports for

4   inspection and copying by Prime not later than December 4, 2009. On December 3, 2009, the

5   Fourth District Court of Appeal issued a stay of the trial court's order.

6        3. The CEQA Action

7        On November 6, 2009, the petitioners filed a Verified Petition for Writ of Mandate;

8   Complaint for Declaratory Relief and Injunctive Relief in Case No. RIC539783, styled Prime

9   Healthcare Management, Inc., et al. v. Valley Health System, et al., in the Superior Court of

10   California, County of Riverside. In their complaint, the petitioners allege, in pertinent part, that

11   the ASA between VHS and PHH constitutes a "project" within the scope of the California

12   Environmental Quality Act ("CEQA"),[35] and that VHS abused its discretion by failing to perform

13   an environmental analysis pursuant to CEQA before placing the ASA on the ballot for voter

14   approval.[36] The petitioners further allege that because PHH would likely develop the agricultural

15   property adjacent to the Menifee Hospital, VHS abused its discretion by failing to obtain

16   planning agency approval for the proposed sale in violation of California Government Code §

17

18

---

19   [34] Cal. Gov't Code § 6250, et seq. Prime's lawsuit was preceded by a "Notification of Intent to
File State Court Action Against Debtor for Violation of California Public Records Act" filed
20   with this court on October 27, 2009. Prime did not seek relief from the automatic stay before
commencing the lawsuit, reasoning that its claims are based upon or arise out of VHS's acts or
21   omissions taken after the petition date.

22

[35] Cal. Pub. Res. Code § 21000, et seq.

23

24   [36] Between October 12-18, 2009, Prime executed written agreements with Lewis, Lloyd, and
Fazekas under the terms of which Prime agreed to indemnify and hold Lewis, Lloyd, and Fazekas
25   each harmless "from and against any and all liability, loss, fines, penalties, damage, claims or
causes of action and expenses associated therewith (including, without limitation, court costs and
26   attorneys' fees) caused directly or indirectly by [each of them] serving as a plaintiff in an action
against Valley Health System and its Board of Directors." See Exhibits 248:1, 249:2, and 250:2.

27

1   65402.[37]  On December 3, 2009, VHS filed a notice with the state court removing the action to

2   this court under Adversary No. 6:09-ap-01708-PC.

3       4.  The Government Code § 1090 Action

4       On October 13, 2009, the petitioners filed a motion seeking relief from the automatic stay

5   to file a complaint for an injunction and declaratory judgment in state court specifically to

6   "obtain an order voiding the ASA and requiring a fair and open sale process before the scheduled

7   voter referendum on December 15, 2009."[38]  The petitioners alleged that "cause" existed for

8   relief from the stay because (a) the VHS Board of Directors illegally approved a sale of

9   substantially all of its assets to PHH without entertaining bids by other potential purchasers; (b)

10  at the time the ASA was approved, certain members of VHS's Board of Directors had a financial

11  interest in the transaction because they were employed by, or derived financial benefits from,

12  Chaudhuri, one of the principals of PHH, in violation of California Government Code § 1090;

13  and (c) VHS failed to obtain approval from the Riverside Local Agency Formation Commission

14  ("Riverside LAFCO") of its decision to exit the hospital business in violation of the Cortese-

15  Knox-Hertzberg Local Government Reorganization Act of 2000, California Government Code §

16  56000, et seq. ("Cortese-Knox").

17      After an expedited hearing on November 2, 2009, and a continued hearing on November

18  12, 2009, the court denied the petitioners' request for relief from the automatic stay by order

19  entered on November 23, 2009 (the "November 23rd Order").  Before the November 23rd Order

20  was entered, the petitioners' filed a document entitled "Renewed Motion for Relief from the

21  Automatic Stay" re-urging its request for stay relief to commence the Government Code § 1090

22  _____

23  [37] The petitioners' lawsuit was preceded by a "Notification of Intent to File State Court Action
    Against Debtor for Violation of the California Environmental Quality Act" filed with this court
24  on November 3, 2009.  The petitioners did not seek relief from the automatic stay before
25  commencing the lawsuit.

26  [38] The petitioners' Memorandum of Points and Authorities in Support of Motion for Relief from
    Automatic Stay to Pursue State Court Litigation, 2:20-22.
27

1   Action and belatedly seeking modification of the stay to purse the CEQA Action.  On November

2   30, 2009, the court denied the petitioners' request for an expedited hearing on the "renewed"

3   motion.  On December 7, 2009, the petitioners filed a notice of appeal with respect to the

4   November 23rd Order and a statement electing to have the appeal adjudicated by the district

5   court.

6       On January 20, 2010, VHS and the petitioners filed a Stipulation to Withdraw Renewed

7   Motion for Relief from Stay, Dismiss Appeal and To Adjudicate Issues Raised by Challenge

8   Actions ("Stipulation") pursuant to which the petitioners withdrew the "renewed" motion and

9   agreed to dismiss their appeal of the November 23rd Order.  VHS and the petitioners also

10  stipulated to this court's jurisdiction to adjudicate the claims raised in the Challenge Actions in

11  conjunction with confirmation of VHS's First Amended Plan.[39]  An order approving the

---

[39] Pursuant to the Stipulation, VHS and the petitioners agreed that:

> C. Subject to paragraph D. below, the Bankruptcy Court shall hear and decide: (1) all of the causes of action set forth in the Challenge Actions, including those set forth in the First Amended Complaint, and (2) all grounds for opposing the Sale . . . .  The Bankruptcy Court shall have the authority to make any findings and orders and to grant any relief that could be granted by a state court of competent jurisdiction in ruling on [the petitioners'] claims . . . that (1) the PHH transaction does not provide "fair value" for [VHS's] assets; (2) member(s) of the VHS board who voted to approve the PHH transaction had conflict(s) of interest prohibited by California Government Code section 1090 et seq.; (3) the PHH transaction required approval by LAFCO under Government Code section 56824.12; (4) VHS violated CEQA in connection with the PHH transaction; and (5) the VHS board breached its fiduciary duty in approving the ASA with a "no shop" provision as set forth in section 4.7 thereof (collectively, the "State Law Claims").
>
> D. To the extent that [the petitioners] assert any grounds for opposing the Sale (other than the State Law Claims) that challenge the feasibility of [VHS's First Amended Plan] or otherwise raise issues of bankruptcy law: (1) nothing herein contained shall constitute an admission or concession that any of the [petitioners] have standing or qualify as "parties in interest" for purposes of appearing or being heard in connection with [VHS's] Plan, (2) such objections shall be governed by and decided under applicable provisions of the Bankruptcy Code and cases decided thereunder, and (3) [VHS] reserves all rights to oppose, defend against and dispute any such Plan objections and the bankruptcy court's authority to grant any relief related thereto other than to deny confirmation of its Plan.

1 | stipulation was entered on January 22, 2010.  The appeal pending before the district court under

2 | Case No. EDCV-09-02264 SVW was dismissed on January 29, 2010.  On February 1, 2010,

3 | VHS lodged the 1,822-page administrative record relating to VHS's administrative proceedings

4 | for its challenged approval of the ASA.

5 | G.      The Confirmation Hearing

6 |      On February 9, 2010, the court commenced a hearing on confirmation of VHS's First

7 | Amended Plan.  The petitioners timely filed an objection to confirmation, arguing that VHS's

8 | First Amended Plan was neither "in the best interest of creditors" nor "feasible" as required by §

9 | 943(b)(7).  The petitioners argued that the plan was not feasible for two reasons not tied to the

10 | Challenge Actions: "First, PHH may be prohibited from owning the health care facilities

11 | comprising the bulk of VHS' assets in light of pending federal health care legislation which sets

12 | forth a deadline by which a physician-owned hospital must have a Medicare provider agreement

13 | in place in order to avail itself of the exception permitting physician ownership of a hospital.

14 | Second, it is not clear that PHH has or will be able to obtain the financing necessary to effectuate

15 | the proposed purchase of substantially all of VHS' assets."[40]  Beckman Coulter, Inc., Key

16 | Equipment Finance, Inc., and U.S. Bank, which had also filed timely objections to confirmation

17 | of VHS's First Amended Plan, withdrew their objections prior to the confirmation hearing.

18 |      At the hearing, the court determined that VHS's First Amended Plan satisfied the

19 | requirements of § 943(b)(1) through (6).[41]  The court overruled the petitioners' objection

20 | _____

21 | Stipulation, 2:13-3:5.  The Stipulation is silent as to the petitioners' claim that the sale
contemplated by VHS's First Amended Plan violates California Government Code § 65402.

22 |

23 | [40]  Objection to Confirmation of First Amended Plan for the Adjustment of Debts of Valley
Health System Dated December 17, 2009 by Save the Hospitals, Inc.; Prime Healthcare Services,

24 | Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas, 3:7-12.  The petitioners do not
allege in their objection that the sale contemplated by VHS's First Amended Plan violates

25 | California Government Code § 65402.

26 | [41]  Section 943 sets forth seven requirements for confirmation of a plan in chapter 9.  11 U.S.C. §
943(b).  Section 943(b)(1) also requires that the plan comply with certain chapter 11

27 |

- 17 -

1   premised on § 943(b)(7) in part, finding that the plan is in the best interests of creditors[42] and that

2   the mere existence of pending federal health care legislation did not render the plan infeasible.[43]

3   The court continued the confirmation hearing to February 22, 2010, for an evidentiary hearing

4   with respect to the remaining prong of the petitioners' feasibility objection and the merits of the

5   petitioners' claims in the Challenge Actions. Prior to the continued hearing, VHS made four

6   adjustments to the First Amended Plan pursuant to 11 U.S.C. § 942.[44]

7

8   confirmation standards made applicable to chapter 9 cases by § 901. 11 U.S.C. § 943(b)(1).
    Section 901(a) incorporates the plan confirmation requirements of §§ 1129(a)(2), (a)(3), (a)(6),
9   (a)(8), (a)(10), (b)(1), (b)(2)(A), and (b)(2)(B). 11 U.S.C. § 901(a). The debtor bears the burden
    of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence. In re
10  Pierce County Hous. Auth., 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009); In re Mount Carbon
    Metro. Dist., 242 B.R. 18, 31 (Bankr. D. Colo. 1999). Once these standards are met, the court
11  must confirm the plan. Pierce County, 414 B.R. at 715; see 6 Alan N. Resnick & Henry J.
12  Sommer, Collier on Bankruptcy ¶ 943.03, at 943-7 (15th ed. Rev. 2009).

13  [42] With respect to the "best interest" requirement of § 943(b)(7), the court determined that
    VHS's First Amended Plan provides "a better alternative for creditors than what they already
14  have" and is fair and equitable. See Mount Carbon, 242 B.R. at 34.

15
    [43] The court hereby adopts and incorporates herein by reference its findings of fact and
16  conclusions of law regarding confirmation of VHS's First Amended Plan stated orally and
    recorded in open court at the confirmation hearing on February 9, 2010, pursuant to F.R.Civ.P.
17  52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

18
        In their objection to confirmation, the petitioners did not identify the specific federal
19  health care legislation "which sets forth a deadline by which a physician-owned hospital must
    have a Medicare provider agreement in place in order to avail itself of the exception permitting
20  physician ownership of a hospital." Objection to Confirmation of First Amended Plan for the
    Adjustment of Debts of Valley Health System Dated December 17, 2009 by Save the Hospitals,
21  Inc.; Prime Healthcare Services, Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas,
22  3:7-10. The court notes that a deadline of December 31, 2010 may be applicable under the
    Health Care and Education Reconciliation Act of 2010, H.R. 4872, 111th Cong. § 1106 (2010)
23  (final version).

24  [44] Modification of First Amended Plan for the Adjustment of Debts of Valley Health System
    Dated December 17, 2009. The plan modification did not require further disclosure nor did it
25  adversely change the treatment of the claims of any creditors other than those who had
    voluntarily agreed to subordinate their claims on an individualized basis. VHS's First Amended
26  Plan, as modified, henceforth is VHS's Modified First Amended Plan.
27

- 18 -

1    At the continued hearing on February 22, 2010, the court denied VHS's request that the

2  petitioners' remaining confirmation objection be overruled as brought in bad faith[45] and

3  _____

4  [45] Prior to January 25, 2010, none of the petitioners were creditors of VHS nor did they have any
   discernable interest in VHS's bankruptcy case other than as a potential purchaser of assets from
5  VHS. VHS had specifically reserved its right to challenge the petitioners' standing to object to
   its plan prior to commencement of the confirmation hearing on February 9, 2010. Cf. Calpine
6  Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 531 (3d
7  Cir. 1999) ("Courts that have considered appellate standing in the context of the sale or other
   disposition of estate assets have generally held that creditors have standing to appeal, but
8  disappointed prospective purchasers do not."); Simantob v. Claims Prosecutor, LLC (In re
   Lahijani), 325 B.R. 282, 290 n.13 (9th Cir. BAP 2005) (stating that "disappointed prospective
9  bidders who are not creditors usually do not have standing to appeal").

10

11    The deadline to file objections to confirmation of VHS's First Amended Plan was
   January 25, 2010. In an apparent effort to preempt any issue concerning standing, Prime
12  purchased a claim in the case. On January 22, 2010, Prime purchased a Proof of Claim filed by
   B.P. Cabinets, Inc. on July 17, 2008 (Claims Docket # 88-1), which evidenced an unsecured non-
13  priority claim in the amount of $4,290 for the replacement of countertops at the Hemet Valley
   Hospital on or about October 15, 2007. On January 25, 2010, Prime filed a request for issuance
14  of a notice of the transferred claim pursuant to FRBP 3001(e), together with its objection to
   confirmation of VHS's First Amended Plan.
15

16    The court denied VHS's request to overrule the petitioners' remaining feasibility
   objection as brought in bad faith based upon findings of fact and conclusions of law stated orally
17  and recorded in open court at the hearing on February 22, 2010. The court's findings of fact and
   conclusions of law are adopted and incorporated herein by reference. In its ruling, the court
18  noted that § 1109(b) states that "[a] party in interest, including the debtor, the trustee, a creditors'
19  committee, an equity security holders' committee, a creditor, an equity security holder, or any
   indenture trustee, may raise and may appear and be heard on any issue" in a chapter 11 case. 11
20  U.S.C. § 1109(b). Section 1109(b) is applicable to chapter 9 cases. See 11 U.S.C. § 901(a).
   Save the Hospitals, Inc., Lewis, Lloyd, and Fazekas had no standing to object to confirmation.
21  While it would not have been a stretch to find that Prime – which sought unsuccessfully to
   purchase the assets of VHS being sold under the Modified First Amended Plan and which
22  purchased the B.P. Cabinets' unsecured claim on the eve of the confirmation hearing for the
23  admitted purpose of obtaining "an interest in the bankruptcy case" so it could object to the plan –
   did so for an improper purpose, the court noted that "[t]here is no per se rule denying 'party in
24  interest' status to the purchaser of a claim against a [debtor]." In re Zaleha, 162 B.R. 309, 313
25  (Bankr. D. Idaho 1993). Prime did not purchase the claim for the specific purpose of controlling
   the vote of a class of claims to block confirmation of the plan. See Figter Ltd. v. Teachers Ins. &
26  Annuity Ass'n of Am. (In re Figter), 118 F.3d 635, 639 (9th Cir. 1997) (observing that courts
   "have been sensitive to situations where a company, which was not a preexisting creditor, has
27

- 19 -

1  proceeded to consider VHS's evidence regarding the ability of PHH to obtain the funds necessary

2  to consummate the purchase of VHS's assets under the Modified First Amended Plan.  On

3  February 23, 2010, the court overruled the petitioners' remaining feasibility objection not tied to

4  the Challenge Actions, finding that VHS's Modified First Amended Plan is feasible under §

5  943(b)(7) in that it offers a reasonable prospect of success and is workable.[46]  The court then

6  considered testimony and evidence regarding the Challenge Actions.  At the conclusion of the

7  hearing on February 26, 2010, the matter was taken under submission.

8                                            II. DISCUSSION

9        This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and

10  1334(b).  The issues before the court involve both core and non-core matters.  Confirmation of a

11  plan of adjustment under chapter 9 is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and

12  (O).  The Challenge Actions involve the State Law Claims.  To the extent that the Challenge

13  Actions are non-core, the parties have stipulated to the jurisdiction of this court to adjudicate the

14  Challenge Actions in conjunction with confirmation.[47]  Venue is appropriate in this court.  28

15  U.S.C. § 1409(a).

16

17

_____

18  purchased a claim for the purpose of blocking an action against it.").  As the holder of an

19  unsecured claim, Prime's interest in the proceeding is within the zone of interests that Congress
    intended to protect with respect to the particular issues raised under § 943(b)(7).  Finally,

20  whether or not Prime purchased the claim for the sole purpose of permitting it to object to
    confirmation, the court has an independent obligation to determine that a proposed plan meets

21  the confirmation requirements of § 943(b), notwithstanding creditor approval.  Mount Carbon,

22  242 B.R. at 36.

23  [46]  The court hereby adopts and incorporates herein by reference its findings of fact and
    conclusions of law regarding confirmation of VHS's Modified First Amended Plan stated orally

24  and recorded in open court at the continued confirmation hearing on February 23, 2010, pursuant
    to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by

25  FRBP 9014(c).

26
    [47]  See Stipulation, supra note 39.
27

                                            - 20 -

1  A.    VHS's Board of Directors Did Not Violate a Fiduciary Duty by Approving the ASA with
       an Unconditional "No Shop" Provision

2
       Petitioners claim that VHS's Board of Directors elected to "disable itself from even
3
considering better offers for the purchase of its assets by agreeing to an airtight 'no shop' clause
4
in the ASA" and that its decision to do so "violates its fiduciary duties."[48]  Section 4.7 of the
5
ASA contains the following provision:
6
       No Shop.  Provided that Purchaser is not in material breach or default of this Agreement,
7      for which Seller has provided Purchaser with notice specifying such material breach or
       default and the reasonable opportunity to cure such material breach or default, Seller shall
8      not, prior to the earlier of the Closing or termination of this Agreement, without the prior
       written consent of Purchaser:  (i) offer for sale, lease or other disposition, the assets of the
9      Hospital Businesses or the Assets (or any portion thereof); (ii) solicit offers or consider
       unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any
10     of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than
       Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt;
11     or (iv) enter into any agreement with any party (other than Purchaser) with respect to the
       sale or other disposition of any of the Hospital Businesses or the Assets.
12
AR01768.  VHS declined to consider an offer from Prime due to the "no shop" clause in the
13
ASA.[49]  Petitioners claim that the VHS Board of Directors had a fiduciary duty both to VHS's
14
creditors and the constituents of the heath care district to maximize the benefits of any asset sale
15
by considering competing offers.  However, the petitioners are unable to identify any statute or
16
case law imposing such a fiduciary duty on directors of a California health care district.
17
Nevertheless, the petitioners argue that the VHS Board of Directors considered itself bound by
18
fiduciary duties, pointing to Hippert's statement at the Board of Directors meeting on July 29,
19
2009, that the sale of VHS's assets must be considered "if we are to carry out the fiduciary
20
responsibilities each of us pledged to do when we were elected to serve on its Board."[50]  VHS, on
21

22  _____

    [48] Plaintiffs' Trial Brief, 24:24-26.
23
    [49] By letter dated August 13, 2009, Prime expressed an interest in purchasing substantially all of
24  the assets of VHS for an unspecified amount.  AR00386.  At the hearing, Prime made an offer of
    proof that Prime's offer represented a better alternative for VHS's creditors and the public than
25  the ASA.

26  [50] AR00026.
27
                                          - 21 -

1   the other hand, asserts that it was under no statutory or regulatory restriction which precluded it

2   from approving a sale agreement containing a "no shop" provision.

3       A typical "no shop" clause prohibits a seller from soliciting or considering new or

4   alternative bids for assets subject to an existing asset sale agreement.[51] Outside of bankruptcy, no

5   shop clauses and other lock-up agreements are not per se invalid but rather are evaluated on a

6   case by case basis and viewed in the context of the entire negotiated transaction. See, e.g., Cottle

7   v. Storer Commc'n, Inc., 849 F.2d 570, 575 (11th Cir. 1988) ("While lock-ups in a takeover

8   situation are not per se illegal, they may be illegal in particular cases."); Jewel Cos., Inc. v. Pay

9   Less Drug Stores Nw., Inc., 741 F.2d 1555, 1562 (9th Cir. 1984) (holding that under California

10   law, a corporation's board of directors may enter into an exclusive merger agreement with the

11   board of directors of another corporation pending submission of the agreement to shareholders

12   for approval); Paramount Commc'ns, Inc. v. QVC Network, Inc., 637 A.2d 34, 49 n.20 (Del.

13   1994) (holding that a no-shop clause, when combined with the sale of control and other

14   protective provisions, was invalid because it prevented the directors "from carrying out their

15   fiduciary duties in considering unsolicited bids or in negotiating for the best value reasonably

16   available to stockholders"); Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173,

17   176 (Del. 1986) ("In our view, lock-ups and related agreements are permitted under Delaware

18   law where their adoption is untainted by director interest or other breaches of fiduciary duty.").

19   Courts apply the business judgment rule[52] to determine whether a corporation's board of

20

---

21   [51] See generally George V. Varallo & Srinivas M. Raju, A Process Based Model for Analyzing

22   Deal Protection Measures, 55 Bus. Law 1609, 1616-18 (2000).

23   [52] California's business judgment rule is codified in California Corporations Code § 309(a),
which states:

24

25       A director shall perform the duties of a director, including duties as a member of any
committee of the board upon which the director may serve, in good faith, in a manner

26       such director believes to be in the best interests of the corporation and its shareholders
and with such care, including reasonable inquiry, as an ordinarily prudent person in a like

27

1    directors' decision to adopt a no-shop clause in a particular transaction is fair and reasonable to

2    the corporation and its shareholders.  See, e.g., Cottle, 849 F.2d at 577 ("The business judgment

3    rule thus prevents us from second guessing the directors' decision to grant the lock-up."); Jewel

4    Cos., 741 F.2d at 1562 ("In light of California's statutory scheme preserving the board's

5    traditional management function in the case of corporate control transactions, we see no reason to

6    conclude that the drafters of the Corporate Code intended to deprive a corporate board of the

7    authority to agree to refrain from negotiating or accepting competing offers until the shareholders

8    have considered an initial offer."); Revlon, Inc., 506 A.2d at 185 (holding that the board's

9    decision to grant an asset option lock-up with a no-shop provision represented a breach of the

10   directors' duty of care under the circumstances of the case, and was "not entitled to the deference

11   accorded it by the business judgment rule").

12        In the chapter 11 context, a debtor in possession stands in the shoes of a trustee and is a

13   fiduciary for the estate and its creditors.  11 U.S.C. § 1107(a); see, e.g., Thompson v. Margen (In

14   re McConville), 110 F.3d 47, 50 (9th Cir. 1997) (stating that chapter 11 debtors in possession

15   "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"),

16   cert. denied, 522 U.S. 966 (1997); Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839

17   F.2d 610, 614 (9th Cir. 1988) ("As debtor in possession he is the trustee of his own estate and

18   therefore stands in a fiduciary relationship to his creditors.") (footnote omitted); Devers v. Bank

19   of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985) ("A debtor-in-possession

20   has the duty to protect and conserve property in his possession for the benefit of creditors.").

21        When the debtor is a corporation, the debtor in possession's fiduciary obligations to the

22

23   ───────────────

24        position would use under similar circumstances.

25   Cal. Corp. Code § 309(a).  "The general purpose of the business judgment rule is to afford
     directors broad discretion in making corporate decisions and to allow these decisions to be made
26   without judicial second-guessing in hindsight."  F.D.I.C. v. Castetter, 184 F.3d 1040, 1044 (9th
     Cir. 1999).

27

- 23 -

1    corporation, its creditors and shareholders, fall upon the officers and directors.  See Commodity

2    Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) (stating that "the debtor's

3    directors bear essentially the same fiduciary obligation to creditors and shareholders as would the

4    trustee for a debtor out of possession"); Wolf v. Weinstein, 372 U.S. 633, 649 (1963) (observing

5    that "so long as the Debtor remains in possession, it is clear that the corporation bears essentially

6    the same fiduciary obligation to the creditors as does the trustee for the debtor out of

7    possession") (emphasis in original); Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.), 145

8    B.R. 637, 643 (9th Cir. BAP 1992) ("When the debtor is a corporation, corporate officers and

9    directors are considered to be fiduciaries both to the corporate debtor in possession and to the

10    creditors.").  Corporate officers, as fiduciaries, must protect and preserve estate assets held in

11    trust for the benefit of creditors.  Holta, 145 B.R. at 643; Hirsch v. Penn. Textile Corp. (In re

12    Centennial Textiles, Inc.), 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor

13    in possession and its managers are obligated to treat all parties to the case fairly, maximize the

14    value of the estate, and protect and conserve the debtor's property.") (internal citations omitted).

15         Not surprisingly, courts have scrutinized deal protection measures, such as break-up

16    fees,[53] no-shop clauses, and window shop provisions,[54] built into asset sales for which approval is

17    sought by a chapter 11 debtor in possession under § 363.  See, e.g., In re Reliant Energy

18    Channelview LP, 594 F.3d 200, 210 (3d Cir. 2010) (holding that "[t]he Bankruptcy Court did not

19    abuse its discretion when it concluded that an award of a break-up fee was not necessary to

20    preserve the value of the estate"); O'Brien Envtl. Energy, Inc., 181 F.3d at 535 (stating that it is

21

22    _____

23    [53]   A break-up fee "'is an incentive payment to an unsuccessful bidder who placed the estate
       property in a sales configuration mode . . . to attract other bidders to the auction.'"  Official

24    Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147
       B.R. 650, 659 (S.D.N.Y. 1992), appeal dism'd, 3 F.3d 149 (2d Cir. 1993) (citation omitted).

25    [54]   "A window shop clause is a promise not to solicit a later, better offer, but which permits a

26    board to look at such an offer, provide information to the offeror, and, under appropriate
       circumstances, accept the offer.  Id. at 655.

27

1  permissible to offer a break-up fee and reimbursement of expenses to induce an initial bid,

2  provided the allowance of the fee is necessary to preserve the value of the estate and does not

3  give an advantage to a favored purchaser over other bidders by increasing the cost of

4  acquisition); Integrated Res., Inc., 147 B.R. at 664 (upholding bankruptcy court's decision to

5  approve an agreement negotiated by a disinterested board of directors after discussions with 30

6  potential bidders and before the debtors selected a purchaser and agreed to a break-up fee and

7  window shop provision).  In Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big

8  Rivers Elec. Corp.), 233 B.R. 739 (W.D. Ky. 1998), a district court held that a chapter 11 debtor

9  in possession could not enter into an agreement with a "no shop" clause, preventing the debtor

10 from actively soliciting or entertaining competing offers with other entities.  Id. at 752.  The

11 bankruptcy court had ruled that the agreement violated public policy because the "no shop"

12 clause interfered with the debtor's fiduciary obligation to maximize the estate's value.  In re Big

13 Rivers Elec. Corp., 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998).  The district court affirmed on

14 this issue, noting that "[t]his prohibition violates the underlying policy of the Bankruptcy Code to

15 maximize the value of the estate for the creditors by stifling the bidding process for the assets of

16 the debtor."  Big Rivers Elec. Corp., 233 B.R. at 753.

17        Unlike chapter 11, there is no concept of a debtor in possession in chapter 9.[55]  Section

18 541, which defines "property of the estate," is not incorporated into chapter 9.[56]  Nor is § 363,

19 which regulates the use, sale or lease of property, applicable to a chapter 9 case.  See 11 U.S.C. §

20 901(a).  By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete

21 control over its property and its operations, and is not restricted in its ability to sell, use, or lease

22 _____

23 [55] The term "'trustee', when used in a section that is made applicable to a case under [chapter 9]
   by section 103(e) or 901 . . . , means debtor, except as provided in section 926 . . . ."  11 U.S.C. §
24 902(5).

25 [56] 11 U.S.C. § 901(a).  The term "'property of the estate', when used in a section that is made
26 applicable in a case under [chapter 9] by section 103(e) or 901 . . . , means property of the
   debtor."  11 U.S.C. § 902(1).
27

1    its property.[57]

2        VHS is neither a chapter 11 debtor in possession nor a corporation.  VHS is a California

3    health care district in chapter 9.  VHS exists by virtue of the LHCDL, and its powers are

4    enumerated in California Health & Safety Code § 32121.  VHS is authorized by statute "[t]o

5    transfer, at fair market value, any part of its assets to one or more nonprofit corporations to

6    operate and maintain the assets."  Cal. Health & Safety Code § 32121(p)(1).  There is nothing in

7    § 32121 nor any other section of the LHCDL imposing fiduciary obligations on the board of

8    directors of a local hospital district.[58]  Furthermore, § 32121(p)(1), by its terms, does not require

9    _____

10    [57] Section 904 states:

11    
12        Notwithstanding any power of the court, unless the debtor consents or the plan so
    provides, the court may not, by any stay, order, or decree, in the case or otherwise,
    <u>interfere</u> with –

13    
14        (1) any of the political or governmental powers of the debtor;
    (2) any of the property or revenues of the debtor; or
    (3) the debtor's use or enjoyment of any income-producing property.

15    

16    11 U.S.C. § 904 (emphasis added).  Section 105(a) is not applicable to chapter 9 cases.  11
U.S.C. § 901(a).  To the extent that the court has power to issue certain orders under a specific

17    provision of the Code incorporated into chapter 9, that authority is equally limited by § 904.

18    [58] Arguably, the VHS directors as public officials each bear the same fiduciary relationship

19    towards their constituents as a "trustee bears to his <u>cestui que trust</u>, and should therefore act with
the utmost good faith."  <u>See Hobbs, Wall & Co. v. Moran</u>, 109 Cal. App. 316, 319 (1930).  "'A

20    public office is a public trust created in the interest and for the benefit of the people.  Public
officers are obligated . . . to discharge their responsibilities with integrity and fidelity . . . . [T]hey

21    may not exploit or prostitute their official position for their private benefits.  When public
officials are influenced in the performance of their public duties by base and improper

22    considerations of personal advantage, they violate their oath of office and vitiate the trust reposed
in them, and the public is injured by being deprived of their loyalty and honest services.  It is

23    therefore the general policy of this state that public officers shall not have a personal interest in
any contract made in their official capacity.'"  <u>Breakzone Billiards v. City of Torrance</u>, 81

24    Cal.App.4th 1205, 1232 (2000) (quoting <u>Terry v. Bender</u>, 143 Cal.App.3d 198, 206 (1956)).

25    Section 1090 of the California Government Code was enacted for the specific purpose of
"ferreting out any financial conflicts of interest, other than remote or minimal ones, that might

26    impair public officials from discharging their fiduciary duties with undivided loyalty and

27

1  competitive bidding.

2       Competitive bidding in California is governed by statute.  Wilson v. L.A. County Metro.

3  Transp. Auth., 23 Cal.4th 305, 313 (2000).  No public entity in California is bound to engage in

4  competitive bidding absent a statutory mandate to do so.  Constr. Indus. Force Account Council

5  v. Amador Water Agency, 71 Cal.App.4th 810, 815 (1999).  "While there are 'powerful purposes

6  served by competitive bidding [e.g., preventing waste, favoritism, and corruption], there is no all-

7  pervasive public policy that requires all public entities to engage in that practice.  Rather, the

8  Legislature imposes competitive bidding requirements on public entities within its purview when

9  the Legislature determines it is in the public interest to do so.'"  Id. (quoting San Diego Serv.

10 Auth. for Freeway Emergencies v. Superior Court, 198 Cal.App.3d 1466, 1469 (1988)).

11      When the California legislature intends to require competitive bidding, it knows how to

12 draft legislation to accomplish that result.  See, e.g., Cal. Health & Safety Code § 32319(a) ("The

13 board of directors may sell the bonds pursuant to the resolution . . . [b]y giving notice inviting

14 sealed bids and selling to the highest responsible bidder."); Cal. Health & Safety Code § 32311

15 ("At the time appointed, the board of directors shall open the proposals, and may sell the bonds

16 or any portion thereof to the highest responsible bidder or bidders."); Cal. Gov't Code § 43627

17 ("Before selling the bonds, or any part thereof, the legislative body shall give notice inviting

18 sealed bids in such a manner as the legislative body may prescribe.  If satisfactory bids are

19 received, the bonds offered for sale shall be awarded to the highest responsible bidder."); Cal.

20 Pub. Res. Code § 5790.7(b) ("The board of directors shall award the sale of bonds to the highest

21 responsible bidder."); Cal. Educ. Code § 15148 ("If satisfactory bids are received, the bonds

22 offered for sale shall be awarded to the highest responsible bidder or bidders . . . ."); Cal. Harb. &

23 Nav. Code § 72(b) ("At the time and place fixed in the notice, the legislative body shall meet and

24 consider all bids that have been submitted.  The lease shall be awarded to the highest responsible

25 _____

26 allegiance to the public entities they are obligated to serve."  Lexin v. Superior Court, 47
   Cal.App.4th 1050, 1073 (2010).

27

1    bidder . . . ."). The fact that California Health & Safety Code § 32121(p)(1) is silent with respect

2    to competitive bidding must be accorded meaning, particularly given the unambiguous language

3    of the statute. Cf. Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("'[W]here

4    Congress includes particular language in one section of a statute but omits it in another section of

5    the same Act, it is generally presumed that Congress acts intentionally and purposely in the

6    disparate inclusion or exclusion.'") (quoting Russello v. United States, 464 U.S. 16, 23 (1983);

7    Progressive West Ins. Co. v. Preciado, 479 F.3d 1014, 1018 (9th Cir. 2007) ("'Faced with

8    statutory silence . . . , we presume that Congress is aware of the legal context in which it is

9    legislating.'") (quoting Abrego v. Dow Chem. Co., 443 F.3d 676, 683-84 (9th Cir. 2006) (per

10   curiam).

11          The VHS Board of Directors must exercise the authority granted under California Health

12   & Safety Code § 32121 in the public interest.[59] Its decisions may be reviewed by writ of mandate

13   and set aside for abuse of discretion. Cal. Civ. Proc. Code § 1094.5. Directors are subject to

14   civil and criminal liability for contracts made by them in their official capacity in which they hold

15   a personal or financial interest. Cal. Gov't Code §§ 1090, 1097. They can be removed for

16   willful or corrupt misconduct in office. Id. § 3060. Any contract approved by the board of

17   directors that is tainted by a conflict of interest may be declared void. Id. § 1092(a). But the

18   petitioners have failed to establish that the VHS Board of Directors in approving the ASA with a

19   "no-shop" provision either breached a specific fiduciary duty imposed by law or violated any

20   statutory obligation to submit the proposed sale of assets to a competitive bidding process.

21   B.     No Member of VHS's Board of Directors Who Voted to Approve the ASA Was
            "Financially Interested" in the Contract in Violation of California Government Code §
22          1090

23          Petitioners accuse Cherry, Dreier, and Rao, three of VHS's seven directors, of public

24

25

26   ────────────────

     [59] See supra note 58.
27

1   corruption.[60]  Petitioners charge that PHH is, in fact, a front for Chaudhuri, an influential

2   physician who lives and works in Riverside County, and that Cherry, Dreier, and Rao violated

3   the public trust by approving the ASA in their official capacities in violation of California

4   Government Code § 1090 primarily to line the pockets of Chaudhuri and professional

5   corporations in which Chaudhuri owns an interest.  To establish that each of these directors has

6   an impermissible "financial interest" in the ASA in violation of § 1090, the petitioners ask the

7   court to draw inferences from evidence of a web of business relationships and personal contacts

8   involving Cherry, Dreier, Rao, and these professional corporations.  In particular, the petitioners

9   point out that some of these professional corporations have filed proofs of claim against VHS.[61]

10  As part of the consideration for the purchase of VHS's assets, PHH agreed to assume liability for

11  certain claims and to indemnify and hold VHS harmless for the payment of such claims.[62]

12  _____

13  [60] Petitioners do not allege that Hippert, O'Donnell, Holmes, or Wilson were financially
    interested in the ASA at the time it was approved by VHS or that they otherwise engaged in
14  conduct in violation of California Government Code § 1090.

15  [61] The proofs of claim include: (1) Claim # 134-1 filed by HCMG in an "unknown" amount on
16  August 22, 2008, based upon an alleged breach of a Risk Sharing Agreement between the Hemet
    Hospital and HCMG dated December 29, 1994; (2) Claim # 135-1 filed by LHIO in an
17  "unknown" amount on August 22, 2008, based upon an alleged breach of an Information
    Technology Services Agreement between LHIO and VHS dated May 22, 2006; (3) Claim # 136-
18  1 filed by HCMG in an "unknown" amount on August 22, 2008, based upon an alleged breach of
    a Risk Sharing Cooperation and Support Agreement between VHS and HCMG dated March 27,
19  2006; and (4) Claim # 168-1 filed by Menifee Valley Community Medical Group, Inc. in an
20  "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing
    Cooperation and Support Agreement between VHS and Menifee Valley Community Medical
21  Group, Inc. dated March 27, 2006.

22  [62] Section 1.2.1 **Purchaser's Estimate of Purchase Consideration** states, in pertinent part:

23
        "(v) <u>Assumed Rejection Claims</u>.  The satisfaction or assumption by Purchaser of, and the
24      full and complete release of Seller from any liability under, the rejection and/or breach
25      claims filed by KM Strategic Management, Inc. ("KM"), Hemet Community Medical
        Group ("HCMG"), Menifee Valley Community Medical Group ("MVCMG"), LHIO,
26      LLC ("LHIO"), and any claims of constituent members thereof which are derivative from
        such rejection and/or breach claims of KM, HCMG, MVCMG or LHIO, which Purchaser
27

- 29 -

1  Petitioners maintain that Cherry, Dreier, and Rao each had a conflict of interest when they voted

2  to approve the ASA notwithstanding a business relationship with one or more of these claimants.

3  VHS does not materially dispute the connections traced by the petitioners, but denies the

4  inferences made by the petitioners and argues that the interest, if any, of each of the targeted

5  directors under the circumstances of this case is too remote and speculative to constitute a

6  prohibited conflict of interest under California Government Code § 1090.

7      Section 1090 of the California Government Code states that:

8      Members of the Legislature, state, county, district, judicial district, and city
       officers or employees shall not be financially interested in any contract made by them in
9      their official capacity, or by any body or board of which they are members. Nor shall
       state, county, district, judicial district, and city officers or employees be purchasers at any
10     sale or vendors at any purchase made by them in their official capacity.

11     As used in this article, "district" means any agency of the state formed pursuant to
       general law or special act, for the local performance of governmental or proprietary
12     functions within limited boundaries.

13  Cal. Gov't Code § 1090. Section 1090 "codifies the long-standing common law rule that barred

14  public officials from being personally financially interested in the contracts they formed in their

15  official capacities." Lexin, 47 Cal.4th at 1072; see Breakzone Billiards, 81 Cal.App. at 1230

16  (stating that "[t]he purpose of this section is to prohibit self-dealing" by public officials);

17  Thomson v. Call, 38 Cal.3d 633, 645 (1985) ("[T]he policy goals of section 1090 support the rule

18  that public officers 'are denied the right to make contracts in their official capacity with

19  themselves or to become interested in contracts thus made.'") (quoting Stockton P.& S. Co. v.

20  Wheeler, 68 Cal.App. 592, 602 (1924)) (emphasis in original).

21     To establish a violation of § 1090, the plaintiff must establish that (1) the defendant

22

23  _____

24     contends constitutes an assumption and release of claims worth approximately
       $55,000,000 ("Assumed Rejection Claims") as detailed more fully in claim numbers 134,
25     135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding
       Seller harmless with respect to the Assumed Rejection Claims; . . . ."

26
   AR01732-AR01733.
27

- 30 -

1    government official or employee participated in an official capacity in the making of a contract;

2    (2) the defendant had a cognizable financial interest in the contract; and (3) if raised as an

3    affirmative defense, that the cognizable financial interest does not fall within the exceptions set

4    forth in either California Government Code § 1091 or § 1091.5.[63] Lexin, 47 Cal.4th at 1074.

5    "[A]n official has a financial interest in a contract if he might profit from it." People v. Honig,

6    48 Cal.App.4th 289, 333 (1996). Section 1090 is construed liberally to embrace both direct and

7    indirect financial interests.[64] See, e.g., Breakzone Billiards, 81 Cal.App.4th at 1230 ("This

8    statutory prong of the conflict of interest doctrine requires that the official have some interest in

9    the outcome, whether direct or indirect."); Honig, 48 Cal.App.4th at 323 ("This section has long

10   been interpreted as prohibiting an official from having any financial interest in a contract,

11   whether direct or indirect."); Terry v. Bender, 143 Cal.App.2d 198, 208 (1956) ("The fact that

12   [the public official's] interest might be small or indirect is immaterial so long as it is such as

13   deprives the [public] of his overriding fidelity to it and places him in the compromising situation

14   _____

15   [63] VHS asserts that neither Cherry, Dreier, or Rao possess a cognizable financial interest in the
     ASA. Therefore, VHS has not alleged a defense under either California Government Code §§
16   1091 or 1091.5.

17   [64] Courts have approved the following jury instruction for use in prosecuting criminal violations
     of §§ 1090 and 1097:
18

19       The phrase "financially interested" as used in Government Code section 1090 means any
         financial interest which might interfere with a state officer's unqualified devotion to his
20       public duty. The interest may be direct or indirect. It includes any monetary or
         proprietary benefit, or gain of any sort or the contingent possibility of monetary or
21       proprietary benefits. The interest is direct when the state officer, in his official capacity,
         does business with himself in his private capacity. The interest is indirect when the state
22       officer, or agency he directs, enters into a contract in his or its official capacity with an
         individual or entity, which individual or entity, by reason of the state officer's
23       relationship to the individual or entity at the time the contract is entered into, is in a
         position to render actual or potential pecuniary benefits directly or indirectly to the state
24       officer based on the contract the individual or entity has received.
25

26   Honig, 48 Cal.App.4th at 322-23.

27
                                          - 31 -

1   where, in the exercise of his official judgment or discretion, he may be influenced by personal

2   considerations rather than the public good."). "Where the interest is remote and speculative, no

3   conflict of interest is held to be present under the statute." Breakzone Billiards, 81 Cal.App.4th

4   at 1230. A contract made in violation of § 1090 is void. See, e.g., Lexin, 47 Cal.4th at 1073

5   ("Where a prohibited interest is found, the affected contract is void from its inception.");

6   Thomson, 38 Cal.3d at 646 n.15 ("California courts have generally held that a contract in which a

7   public officer is interested is void, not merely voidable.") (emphasis in original).

8       California courts have long recognized that an impermissible conflict of interest arises

9   when a public official on behalf of a public entity participates in making a contract with another

10   entity at which the public official is employed or in which the public official owns an interest.

11   See, e.g., Miller v. City of Martinez, 28 Cal.App.2d 364, 368 (1938); Hobbs, Wall & Co., 109

12   Cal.App. at 321; Stockton Plumbing & Supply Co. v. Wheeler, 68 Cal.App. 592, 602 (1924).

13   Petitioners rely on this line of cases as authority for their charge of public corruption against

14   Cherry, Rao, and Dreier. However, these cases are inapposite.

15       In Stockton Plumbing & Supply Co. v. Wheeler, Charlesworth, a city councilman, was

16   employed as a sheet metal foreman at Stockton Plumbing and Supply Company ("Stockton

17   Plumbing"). Stockton Plumbing & Supply Co., 68 Cal.App. at 595. The City of Stockton

18   planned to build a memorial civic auditorium. Id. at 594. Stockton Plumbing was the lowest

19   responsible bidder for the performance of plumbing, heating, and ventilating work on the project.

20   Id. at 595. Charlesworth, as a member of the "Building Committee"of the city council,

21   supervised a revision of plans for the new auditorium, but was not present at the city council

22   meeting at which the construction contract was awarded. Id. The sole question was whether

23   Charlesworth was "interested" in the contract. Id. at 600. In holding that the contract was void

24   due to Charlesworth's conflict of interest, the court stated:

25       In this case Charlesworth was the sheet metal foreman of the petitioner's establishment
        and the contract proposed to be awarded to petitioner was connected directly with that
26       department of the petitioner's business. Under these circumstances, it would be
        exceedingly strange if Charlesworth were not to a considerable extent desirous of the

27

- 32 -

1    awarding of the contract to his employer. . . . While it may truly be said that he would not
derive direct pecuniary gain from the contract, he certainly would indirectly be so
2    benefited, since upon the success of petitioner's business financially primarily depends
the continued tenure of his position and the compensation which he receives for
3    performing the service required of him as the foreman of the department referred to.

4    Id. at 602.

5        In Hobbs, Wall & Co., Dressler, a city councilman, was employed as manager of Hobbs,

6    Wall & Co., which had sold goods to the city for $249.66. Dressler "was not a stockholder in the

7    corporation and had no direct pecuniary interest in it." Hobbs, Wall & Co., 109 Cal. App. at 317.

8    The city council, including Dressler, voted to pay the claims. J.J. Moran ("Moran"), the city

9    treasurer, refused to pay the warrants issued and presented for payment of the claims. Id. Hobbs,

10   Wall & Co. sought a writ of mandate to compel Moran to pay the warrants. Id. The trial court

11   denied the writ, holding that "Dressler, as the manager of the business from which the supplies

12   were purchased, was indirectly interested in the transaction, and that it was therefore illegal." Id.

13   The court of appeal affirmed the judgment, stating that "Dressler, as manager, had such an

14   interest in his employer's mercantile business as to preclude him from participating, as a member

15   of the council, in the allowance of the claims." Id. at 321.

16       In Miller v. City of Martinez, Severns, a city councilman, was employed by Shell Oil

17   Company ("Shell") as manager of its Martinez office. Miller, 28 Cal.App.2d at 365-66. Severns

18   also owned shares of stock in Shell. Id. at 366. The city council, including Severns, voted to

19   approve payment of Shell's claims for petroleum products and other merchandise purchased by

20   the city and ordered warrants drawn on the city treasury for payment of the sum of $4,639.89. Id.

21   Miller, a taxpayer and resident of the City of Martinez, filed suit to recover the amounts paid

22   alleging that the claims were void due to Severns' conflict of interest. Id. at 365. The trial court

23   entered judgment for the defendants, holding that the complaint failed to state a cause of action.

24   Id. The court of appeal reversed, stating that "[c]ases are numerous in which it has been held that

25   one who is an employee of another, or a corporation or firm, and at the same time a member of

26   the city council of a municipality is ineligible as such official to make or assist in making a

27

- 33 -

1  contract with the person or corporation in whose employment he is, and that a contract so made

2  is void upon the principle that such act would contravene public policy." Id. at 368.

3      In this case, PHH is a Delaware corporation qualified to do business in California.[65]

4  PHH's sole shareholder is PHH, LLC, a Delaware limited liability company qualified to do

5  business in California. PHH, LLC is managed by an Executive Committee and a Managing

6  Member. Chaudhuri is the Managing Member of PHH, LLC.[66] Neither Cherry, Dreier, or Rao

7  are employees of PHH or PHH, LLC nor do they own an interest in either PHH or PHH, LLC.

8      The court agrees with VHS and PHH that the case of Hotchkiss v. Moran, 109 Cal.App.

9  321 (1930), which is the companion case of Hobbs, Wall & Co., is more directly in point. In that

10  case, Hotchkiss Electric Light Company ("Hotchkiss Electric") sold electricity to Crescent City

11  and was owed the sum of $305.82. Hotchkiss, 109 Cal.App. at 323. J.M. Hotchkiss

12  ("Hotchkiss"), the president of Hotchkiss Electric, was also a stockholder in Hobbs, Wall &

13  Company. Id. at 322. Dressler, who was employed as a manager of Hobbs, Wall & Company,

14  was a member of the Crescent City council and chairman of the finance committee. Id. at 322-

15  23. Dressler was not a stockholder in Hobbs, Wall & Company nor a stockholder or employee of

16  Hotchkiss Electric. Id. at 322. The city council, including Dressler, voted to pay the claim of

17  Hotchkiss Electric. Id. at 323. Moran, the city treasurer, refused to pay the warrants issued and

18  _____

19  [65] See supra note 6.

20  [66] To fund a portion of the purchase of VHS's assets by PHH under the ASA, PHH, LLC intends
to undertake a legally compliant, exempt private offering to local community physicians who are
21  accredited investors utilizing a private placement memorandum "Subscription Process." The
primary investors will be local community physicians on the medical staffs of Hemet Hospital
22  and Menifee Hospital. At the closing of the sale of assets by VHS to PHH, investors in PHH,
LLC will receive ownership interests in PHH in proportion to the amount invested. Until this
23  syndication is completed, it is unknown what percentage any particular investor will have in
PHH or PHH, LLC. At the confirmation hearing on February 22, 2010, the court determined that
24  PHH would have the $56,150,000 needed to meet its obligations under the ASA. However,
Chaudhuri has agreed to invest, loan, or contribute funds necessary to permit PHH to meet its
25  obligations on the Sale Closing Date under the ASA to the extent PHH's offerings are
insufficient to fund the transaction.
26
27

- 34 -

1   presented for payment of the claim.  Id.  Hotchkiss sought a writ of mandate, and the trial court

2   ordered a writ of mandate to issue directing Moran to pay the warrants.  Id.  The court of appeal

3   affirmed, holding that "Dressler was not employed with or interested in the electric lighting

4   company, directly or indirectly."  Id.  In so holding, the court stated:

> It may not reasonably be said a contract for lighting a city violates the Municipal
> Corporation Act merely because the councilman who participates in the transaction is the
> manager of a mercantile business in which a prominent stockholder of the electric
> company is also a stockholder.  The interest of the councilman under such circumstances
> is too remote and speculative upon which to assume the contract will be thereby affected.

8   Id.; see Breakzone Billiards, 81 Cal.App.4th at 1230-31 ("Where the interest is remote and

9   speculative, no conflict of interest is held to be presented under the statute.  This has been the

10  rule since Hotchkiss v. Moran . . . .").

11      Petitioners presented extensive evidence at trial of contractual or employment

12  relationships between Cherry, Rao, and Dreier's husband, Dr. Ralph G. Dreier, M.D. ("Dr.

13  Dreier") and professional corporations in which Chaudhuri is an officer, director, or shareholder.

14  But whether any of these connections place Cherry, Rao, or Dreier in a position to receive,

15  directly or indirectly, an actual or pecuniary benefit based on the contract with PHH is, at best,

16  remote and speculative.

17      1. Chaudhuri and Related Entities

18      In addition to serving as the Managing Member of PHH, LLC, Chaudhuri is an officer,

19  director, or shareholder in each of the following professional corporations that provide medical

20  services to Riverside County:  HCMG; Menifee Valley Community Medical Group, Inc. (the

21  "Menifee Medical Group"); Temecula Valley Physicians Medical Group, Inc. (the "Temecula

22  Medical Group"); Devonshire Surgical Medical Group, Inc. ("Devonshire"); and Hemet

23  Healthcare Surgery Center, Inc. ("Hemet Surgery").

24      HCMG is a California professional corporation which operates as an independent

25  physicians association ("IPA").  HCMG contracts to provide medical care to health maintenance

26  organization ("HMO") enrollees residing in Hemet, San Jacinto, Sun City, Menifee, Lake

27

- 35 -

1  Elsinore, Wildomar, Canyon Lake, Corona, Temecula, Murrieta, Idyllwild, Anza, and the

2  surrounding unincorporated areas of Riverside County. HCMG is co-owned by approximately

3  45 physicians. Chaudhuri is Chairman of the Board of Directors of HCMG and owns a 38%

4  interest in the corporation. Chaudhuri has authority to terminate an HCMG contract with any

5  physician, subject to approval of HCMG's board of directors. Six of the initial investors in PHH,

6  who collectively have committed to invest in excess of $20 million in PHH, own 9% of the

7  equity in HCMG. Another 15 of the 49 physicians who have issued checks for $1,000 to PHH,

8  other than Chaudhuri, collectively own 23% of the equity in HCMG. HCMG, however, is not an

9  investor in PHH or PHH, LLC.

10        The Menifee Medical Group is a California professional corporation and a HCMG group

11  provider, operating as an IPA that accesses health plan contracts through HCMG for HMO

12  enrollees in the Menifee/Sun City area. Chaudhuri is the Chairman of the Board of Directors and

13  CEO of Menifee Medical Group. Chaudhuri has authority to terminate Menifee Medical

14  Group's contract with any physician, subject to approval of Menifee Medical Group's board of

15  directors. Chaudhuri is also the sole shareholder of the Menifee Medical Group. The Menifee

16  Medical Group is not an investor in PHH or PHH, LLC.

17        The Temecula Medical Group is a California professional corporation and a HCMG

18  group provider, operating as an IPA that accesses health plan contracts through HCMG for HMO

19  enrollees in Temecula, Lake Elsinore, Canyon Lake, Wildomar, Murrieta, and the surrounding

20  unincorporated areas of Riverside County. Chaudhuri is the Chairman of the Board of Directors

21  of Temecula Medical Group. Chaudhuri has authority to terminate Temecula Medical Group's

22  contract with any physician, subject to approval of Temecula Medical Group's board of directors.

23  Chaudhuri is also the majority (90%) shareholder of the Temecula Medical Group. Temecula

24  Medical Group is not an investor in PHH or PHH, LLC.

25        Devonshire is a surgical group comprised of independent contractor surgeons which

26  provide general, vascular and thoracic services to HCMG and its group provider, Menifee

27

-36-

1  Medical Group. Chaudhuri is a one-third minority shareholder of Devonshire. David Sizemore,

2  M.D. ("Sizemore") is President of Devonshire. Chaudhuri is not an officer of the corporation.

3  However, Devonshire is managed by KM Strategic Management, LLC ("KM"), which is owned

4  by Chaudhuri and Mike Foutz. While each of the principals of KM are committed to invest in

5  PHH, Devonshire is not an investor in PHH or PHH, LLC.

6         Hemet Surgery is a California professional corporation that operates an ambulatory

7  surgery facility in Hemet. Hemet Surgery contracts directly with HMOs, PPOs, Medicare,

8  MediCal, private insurers, and individuals to provide outpatient surgical services in the Hemet,

9  San Jacinto, Menifee, and Sun City areas. Hemet Surgery does not contract directly with

10 HCMG. Hemet Surgery is co-owned by six physicians, including Chaudhuri. Chaudhuri is a

11 member of the board of directors of Hemet Surgery. At all times relevant to this case, Kuan

12 Chen, M.D. ("Chen") has served as the President of Hemet Surgery. Chen, Chaudhuri, and

13 Sizemore are on Hemet Surgery's board of directors. Hemet Surgery is not an investor in PHH

14 or PHH, LLC.

15         2. Cherry

16        Petitioners contend that "PHH, by virtue of being controlled by the same group of

17 individuals responsible, directly or indirectly, for virtually all of Cherry's salary paid by

18 Temecula Medical Group and [HCMG], is in a position to render pecuniary benefits to Cherry

19 based on the contract (i.e., the ASA) it received."[67] Petitioners seek a finding that "Cherry had a

20 conflict of interest because he voted to approve the ASA that will compromise a claim of his

21 employer and benefit the Chairman of his employer."[68]

22        Cherry is a physician who has served as a member of VHS's Board of Directors since

23 November 2002. Cherry conducts a private practice in the Menifee/Temecula area through

24

25 [67] Plaintiffs' Trial Brief, 10:20-23.

26 [68] Petitioners' Proposed Findings of Fact and Conclusions of Law, 18:16-18.

27

- 37 -

1  William H. Cherry, M.D., Inc., a wholly-owned professional corporation. Cherry's practice

2  includes providing services for HMOs. Cherry provides primary health care services to health

3  plan enrollees of HCMG pursuant to a Primary Care Professional Service Agreement effective

4  April 1, 2002.[69] He is one of 125 primary care physicians, 900 specialists and 7,500 providers

5  who have agreements with HCMG. The contract with HCMG permits Cherry to access the

6  HMO network for his HMO patients. Cherry currently has 11,040 patient records. Cherry also

7  provides primary care services for HCMG's group provider, Temecula Medical Group, in the

8  Temecula area pursuant to an IPA Primary Care Physician Provider Agreement dated June 1,

9  2004.[70] Cherry accesses a network of medical specialists for his patients through his independent

10 provider agreement with the Temecula Medical Group. He provides these services through

11 William H. Cherry, Inc. and Same Day Medical Care, Inc. For services provided to HMO

12 enrollees, Cherry is compensated through a per member per month capitation fee via a

13 relationship between HCMG and insurance companies. Finally, Cherry is one of fifteen Medical

14 Directors for HCMG pursuant to a Medical Director Agreement with HCMG dated August 1,

15 2005.[71] Cherry serves as a medical director on behalf of HCMG over the geographic service area

16

17 [69] Section 8.1 entitled "Immediate Termination" authorizes HCMG to terminate the contract
18 immediately if the physician engages in "conduct or activity which substantially jeopardizes the
   Group's business reputation." Exhibit 100, Cherry 00073.
19
   [70] Section 6.15 entitled "Disparagement" states: "PCP shall refrain from making or publishing
20 disparaging statements concerning the Company, its directors, officers, shareholders and
   providers and the Company's management . . . and its directors, officers, employees and
21 shareholders." Exhibit 102, Cherry 00007. Section 12.2(c) entitled "Immediate Termination by
   Company" further states, in pertinent part, that the Company may immediately terminate the
22 contract upon written notice if the PCP has "made or published disparaging remarks about the
23 Company." Exhibit 102, Cherry 00013.

24 [71] Section 1.4 of the contract entitled "Public Support for Group / No Disparagement" states:
25 "Physician shall at all times publicly and privately support the Group, its directors, officers and
   representatives." Exhibit 103, Cherry 00025. Section 3.2 entitled "Termination by Group"
26 authorizes termination of the physician for cause upon 30 days written notice and without cause
   upon 90 days written notice to the physician. Exhibit 103, Cherry 00026.
27

1  of Menifee Medical Group.  Cherry's compensation as a medical director has not changed since

2  the inception of the contract.

3      At the time the ASA was approved by VHS, Cherry was an independent contractor of

4  Temecula Medical Group and HCMG.  Cherry has been an outspoken critic of Chaudhuri,

5  notwithstanding the non-disparagement clauses contained in his contracts with HCMG and

6  Temecula Medical Group.  There is no credible evidence that Cherry was unduly influenced by

7  Chaudhuri by virtue of his contractual relationships with HCMG and Temecula Medical Group.

8  Nor is there evidence that Chaudhuri or any other individual either directed Cherry to vote in

9  favor of the ASA or promised consideration to Cherry in exchange for a favorable vote on the

10  ASA.  Cherry is not an investor in PHH or PHH, LLC and has no cognizable financial interest in

11  the ASA, PHH or PHH, LLC.[72]

12      3. Rao

13      Rao has served as a member of VHS's Board of Directors since December 2008.  Rao is

14  employed by Hemet Surgery as its Administrator.  He is an "at will" employee of Hemet Surgery.

15  Petitioners assert that "PHH, by virtue of being controlled by the same group of individuals

16  responsible for Rao's continued employment, salary and bonus at Hemet Surgery, is in a position

17  to render pecuniary benefits to Rao based on the contract (i.e., the ASA) it received."[73]

18  Petitioners seek a finding that Rao had an impermissible conflict of interest under California

19  Government Code § 1090 when he voted to approve the ASA "because he knew that Chaudhuri,

20  the former CEO and significant shareholder of his sole employer, stood to benefit from the

21  ───────────────

22  [72] Indeed, Cherry submitted a statement under penalty of perjury to VHS dated July 20, 2009,
   stating, in pertinent part, that he "will not own any stock or invest in either PHH or any other

23  entity which proposes to purchase any assets of Valley Health System;" that he has "no desire to
   own any stock or to invest in either PHH or any other entity which proposes to enter into a joint

24  venture with Valley Health System;" and that he "will not be an officer, director, partner,

25  manager, or employee of any entity which chooses to either purchase the assets or enter into a
   joint venture with Valley Health System."  Exhibit 244:1

26
   [73] Plaintiffs' Trial Brief, 11:14-16.

27
                              - 39 -

1  assumption of the Assumed Rejection Claims, and from ownership and control of PHH."[74]

2    Chaudhuri is one of 6 minority shareholders of Hemet Surgery. Hemet Surgery contracts

3  directly with HMOs. The HMOs refer their patients directly to Hemet Surgery for outpatient

4  surgery services. Hemet Surgery does not contract with HCMG. Rao is not an investor in PHH

5  or PHH LLC, and has no direct or indirect financial interest in the ASA, PHH, or PHH, LLC.

6  There is no evidence that Chaudhuri or any other individual either directed Rao to vote in favor

7  of the ASA or promised consideration to Rao in exchange for a favorable vote on the ASA. Nor

8  is there credible evidence that Rao was unduly influenced by Chaudhuri due to his employment

9  as Administrator of Hemet Surgery. Chaudhuri is an investor in Hemet Surgery, but does not

10  exercise any operational control over Hemet Surgery and does not hold any management

11  position.

12    4. Dreier

13    Dreier has served as a member of VHS's Board of Directors since June 2009. Petitioners

14  ask the court to find that Dreier had an impermissible conflict of interest under California

15  Government Code § 1090 when she voted to approve the ASA because her husband, Dr. Dreier,

16  a local general surgeon, provides services to Devonshire pursuant to a contract that authorizes

17  Devonshire to terminate the agreement if Dr. Dreier makes disparaging remarks about HCMG or

18  KM.[75] Dreier is not employed by Devonshire, HCMG, or any of the other entities in which

19  Chaudhuri is an officer, director or shareholder.[76] Given her husband's contract with

20  Devonshire, however, the petitioners reason that "PHH, by virtue of being controlled by the same

21

22

23  [74] Petitioners' Proposed Findings of Fact and Conclusions of Law, 29:5-7.

24  [75] Petitioners' Proposed Findings of Fact and Conclusions of Law, 22:18-20.

25  [76] Dr. Dreier submitted a statement under penalty of perjury to VHS dated July 22, 2009, in
    conjunction with his spouse's appointment to the VHS Board of Directors confirming that he

26  "would not be an owner, director or officer of PHH" and that he was "willing to forgo any
    involvement in PHH" to permit her to serve on the board of directors. Exhibit 246:1.

27

1    group of individuals responsible for Mrs. Dreier's salary, is in a position to render pecuniary

2    benefits to Mrs. Dreier based on the contract (i.e., the ASA) it received."[77]

3            Dr. Dreier is a respected surgeon with over 40 years of surgical experience in the Hemet

4    area.  On June 1, 2004, Dr. Dreier agreed to provide Devonshire surgical services on a non-

5    exclusive basis pursuant to a Physician Services Agreement dated June 1, 2004.[78]  Devonshire

6    paid Dr. Dreier $20,000 per month for services provided under this contract.  Dr. Dreier's

7    contract with Devonshire was executed more than five years prior to his wife accepting a position

8    on the VHS Board of Directors.  Prior to June 1, 2004, Dr. Dreier had a contract to provide

9    surgical services to HCMG members through the Hemet Surgeons' Group, Inc.  Dr. Dreier was

10   paid $20,000 per month for his services under his employment agreement with Hemet Surgeons'

11   Group, Inc.  Dr. Dreier's compensation under his contract with Devonshire was increased to

12   $25,000 per month in 2007 based upon patient encounter data[79] which established that additional

13   compensation was warranted given the number of surgeries performed by Dr. Dreier.  Neither

14   Dreier nor her husband, Dr Dreier, own an equity interest in Devonshire.

15           At the time the ASA was approved by VHS, Dr. Dreier was an independent contractor of

16   Devonshire.  Dreier and her husband are not investors in PHH or PHH, LLC.  Neither Dreier or

17   her husband possess a direct or indirect financial interest in the ASA, PHH, or PHH, LLC.  There

18

19   _____

     [77]  Plaintiffs' Trial Brief, 9:16-18.

20

21   [78]  Section 11 entitled "No Disparagement" states: "The parties recognize that the success of the
     Group depends upon sound and mutual supportive relationship with HCMG, its management

22   company, its Board of Directors, Officers, and representatives.  Accordingly, Physician agrees
     that he shall not make disparaging remarks regarding HCMG, its directors, officers,

23   representatives, or its subcontracted management company, KM Strategic Management, LLC or
     its directors, officers, employees or representatives and shall endeavor at all times to be

24   supportive of the aforesaid entities and persons.  Group likewise agrees that it shall make no
     disparaging remarks regarding Physician and it shall, at all times, endeavor to be supportive of

25   Physician."  Exhibit 24, Dreier 0003.

26

     [79]  See Exhibit 245.

27

                                                    - 41 -

1    is no evidence that Chaudhuri or any other individual either directed Dreier to vote in favor of the

2    ASA or promised consideration to Dreier or her husband, Dr. Dreier, in exchange for a favorable

3    vote on the ASA.  Nor is there credible evidence that Dreier was unduly influenced by Chaudhuri

4    due to her husband's contractual relationship with Devonshire.  Chaudhuri is an investor in

5    Devonshire, but does not exercise any operational control over Devonshire and is not an officer

6    of the company.  The fact that Dr. Dreier has not publicly criticized Devonshire, HCMG, or

7    Chaudhuri in the past five years does not support a finding that either he or his spouse has a

8    cognizable financial interest in the ASA.

9          Because the petitioners have failed to establish that either Cherry, Rao, or Dreier had a

10   cognizable financial interest in the ASA at the time it was approved by VHS's Board of

11   Directors, the petitioners' challenge pursuant to California Government Code § 1090 will be

12   dismissed.[80]

13   C.     The PHH Transaction Provides "Fair Value" for VHS's Assets

14         Petitioners' charge that V&IG was not "independent" and that its Fair Consideration

15   Opinion was not rendered "in accordance with applicable governmental and industry standards

16   _____

17   [80] Had the ASA been tainted by the vote of directors "financially interested" in the transaction in
     violation of § 1090, VHS and PHH reason that the election on December 15, 2009, at which
18   voters approved the proposed sale of VHS's assets to PHH by a wide margin, would have
     validated the otherwise void contract, citing City of San Diego v. Furgatch, 2002 WL 1575109
19   (Cal.App.4th Dist.).  The court disagrees.  Furgatch and its progeny stand for the proposition that
     "void municipal contracts that are fully within the powers of the public entity may be effectively
20   ratified if done so in the manner prescribed for the making of the contract." Id. at *12; see Los
     Angeles Dredging Co. v Long Beach, 210 Cal. 348, 359-60 (1930).  In Furgatch, a city council
21   member who was financially interested in certain contracts approved by the city council resigned
     her office due to allegations of misconduct.  A newly composed city council adopted "ordinances
22   designed to reexecute and readopt the alleged ineffective contracts previously consummated."
     Furgatch, 2002 WL 1575109, at *12.  The city then filed an in rem action to validate the
23   ratification ordinances pursuant to California Code of Civil Procedure § 860, et seq. Id. at *1.
24   The trial court granted summary judgment for the city and the court of appeals affirmed, holding
     that summary judgment was proper because as a matter of law, void contracts under sections
25   1090 and 1092 . . . can be legally ratified." Id.  It was ratification by the a city council free of
26   conflicts of interest, not the election, that breathed new life into the otherwise void contracts.

27

1  for appraisal and valuation" as required by California Health & Safety Code § 32121(p)(1).[81]

2  Petitioners allege specifically that:

3       V&IG . . . understood that their job was to justify the bargain basement price to be paid
         by [Chaudhuri], and they initially came in with appraised values that were so low that
4        they surprised VHS's General Counsel, John Marshall ("Marshall").  Marshall instructed
         VHS to prepare higher values and to use those higher values in their appraisals; in
5        violation of the applicable independence rules, V&IG followed his orders.  Indeed,
         Marshall himself drafted the text of key passages in V&IG's fair consideration opinion,
6        and V&IG accepted his text without question.  Notably, V&IG also failed to value many
         of the assets being transferred to PHH, made fundamental errors in valuing the assets it
7        did appraise, and made no effort at all to determine the present value of consideration to
         be paid by PHH under the ASA.

8
   Plaintiff's Trial Brief, 2:5-14.  Petitioners believe that, as a result, VHS is receiving less than
9
   "fair value" for the assets to be sold to PHH.  VHS counters that V&IG is a qualified,
10
   independent valuator which properly appraised VHS's assets by applying accepted industry and
11
   governmental standards of valuation to reach its conclusion that VHS is receiving fair and
12
   reasonable consideration for the assets being transferred under the ASA.
13
        Section 32121(p)(1) of the California Health & Safety Code authorizes VHS, as a local
14
   health care district:
15
        To transfer, at fair market value, any part of its assets to one or more nonprofit
16       corporations to operate and maintain the assets.  A transfer pursuant to this paragraph
         shall be deemed to be at fair market value if an independent consultant, with expertise in
17       methods of appraisal and valuation and in accordance with applicable governmental and
         industry standards for appraisal and valuation, determines that fair and reasonable
18       consideration is to be received by the district for the transferred district assets.  Before the
         district transfers, pursuant to this paragraph, 50 percent or more of the district's assets to
19       one or more nonprofit corporations, in sum or by increment, the elected board shall, by
         resolution, submit to the voters of the district a measure proposing the transfer.  The
20       measure shall be placed on the ballot of a special election held upon the request of the
         district or the ballot of the next regularly scheduled election occurring at least 88 days
21       after the resolution of the board.  If a majority of the voters voting on the measure vote in
         its favor, the transfer shall be approved.  The campaign disclosure requirements
22       applicable to local measures provided under Chapter 4 (commencing with Section 84100)
         of Title 9 of the Government Code shall apply to this election.

23
   Cal. Health & Safety Code § 32121(p)(1) (emphasis added).  Section 32121(p)(1) authorizes
24

25 _____

26 [81]  Petitioners do not dispute the fact that V&IG has expertise in methods of appraisal and
   valuation and is otherwise qualified to render an opinion regarding fair market value for purposes
   of California Health & Safety Code § 32121(p)(1).  See supra note 23.
27

1    VHS to transfer its assets to PHH, a non-profit corporation, for the purpose of operating and

2    maintaining the assets, so long as it does so at fair market value. Id. An appraisal or professional

3    opinion as to value is not a condition for a transfer of assets under § 32121(p)(1). Id. However,

4    a transfer under § 32121(p)(1) is deemed at fair market value if "an independent consultant, with

5    expertise in methods of appraisal and valuation and in accordance with applicable governmental

6    and industry standards for appraisal and valuation, determines that fair and reasonable

7    consideration is to be received by the district" for the assets. Id.

8        1. V&IG Was an Independent Consultant

9        Petitioners assert that V&IG was not independent, claiming that (a) V&IG was instructed

10   by Marshall to assign high values in its appraisals of VHS's assets; and (b) V&IG accepted

11   without inquiry text prepared by Marshall for V&IG's Fair Consideration Opinion describing the

12   assets to be transferred and concluding that fair value was to be received by VHS for the assets

13   under the ASA.

14       (a) Scope of Work

15       The Scope of Work Rule set forth in the Uniform Standards of Professional Appraisal

16   Practice ("USPAP") states:

17       For each appraisal, appraisal review, and appraisal consulting assignment, an appraiser
         must:

18
                 1.    identify the problem to be solved;
19               2.    determine and perform the scope of work necessary to develop credible
                       assignment results; and
20               3.    disclose the scope of work in the report.

21       An appraiser must properly identify the problem to be solved in order to determine the
         appropriate scope of work. The appraiser must be prepared to demonstrate that the scope
22       of work is sufficient to produce credible results.

23   Exhibit 124:22. With regard to Problem Identification, the Scope of Work further states:

24       An appraiser must gather and analyze information about those assignment elements that
         are necessary to properly identify the appraisal, appraisal review or appraisal consulting
25       problem to be solved.

26   Id. In the comment to "Problem Identification," USPAP provides the following guidance for an

27

                                              - 44 -